UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| THE NATURE CONSERVANCY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 06-1096 |
| | ) |
| WILDER CORPORATION OF DELAWARE, | ) |
| | ) |
| Defendant. | ) |

**O R D E R**

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment. For the reasons set forth below, Plaintiff's Motion for Partial Summary Judgment [#22] is GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

Plaintiff, The Nature Conservancy (the "Conservancy"), entered into an agreement dated February 22, 2000, with Defendant, Wilder Corporation of Delaware ("Wilder") (hereinafter referred to as the "Purchase Agreement"). Pursuant to the Purchase Agreement, Wilder agreed to sell the Conservancy 6,660 acres of land, together with buildings and improvements, in Fulton County, Illinois, for $16,350,000.00. The Conservancy purchased this property for use as a nature preserve. The Purchase Agreement was subsequently amended by an Amendment to Purchase Agreement dated March 7-8, 2000 (the "Amendment"). As provided in the Purchase Agreement, upon closing the Conservancy leased the property back to Wilder via a lease dated April 21, 2000 (the "Lease").

Pursuant to the terms of the Purchase Agreement, Wilder was required to remove all rubbish, trash, and hazardous or toxic chemical substances or materials, including petroleum, on the Property prior to closing. Wilder wanted to close the sale of the property on or before May 1, 2000, prior to meeting all of its obligations under the Purchase Agreement. The Conservancy agreed to close the purchase prior to Wilder's cleaning up any rubbish, trash, and hazardous or toxic chemical substances or materials on the property in consideration for the agreements made by Wilder as memorialized in a supplemental agreement dated April 24-25, 2000 (the "Supplemental Agreement").

Under the Supplemental Agreement, the Conservancy withheld $75,000.00 from the purchase price contingent upon Wilder completing its obligations by August 1, 2000. If Wilder did not complete its obligations by that time, the Conservancy was entitled to complete those obligations and deduct the cost from the $75,000.00 withheld. With the exception of the payment of the $75,000.00, Wilder agrees that the Conservancy has performed all conditions to be performed by it under the Purchase Agreement, the Amendment, the Lease, and the Supplemental Agreement.

Wilder and others conducted a cattle operation on the property involving 5,000 - 6,000 head of cattle. Sewage lagoons were maintained on the property to handle the waste generated by the cattle. These lagoons were lagoons as defined in Section 10.25 of the Livestock Management Facilities Act, 510 ILCS 77/10.25 and the Livestock Management Facility Regulations promulgated by the Illinois Department of Agriculture as 8 Ill. Admin. Code § 900.103, and Wilder neither sought nor obtained a waiver of the requirements under 510 ILCS 77/15(e) or 8 Ill. Admin. Code § 900.608(a).

Pursuant to the Supplemental Agreement, Wilder specifically agreed to dispose of all liquids and solids in and around the sewage lagoons on the property in compliance with all legal requirements. In June and August 2001, Wilder obtained several bids to clean out the material in the sewage lagoons ranging from $230,200.00 to $450,000.00. Wilder admits that it did not dispose of the solids in and around the sewage lagoons on the property, but argues that it did dispose of the liquids. However, Wilder admits that the net cost to the Conservancy for the disposal of the liquids and solids in and around the sewage lagoons on the property was $274,888.82.

The Lease required Wilder to pay the real estate taxes due for the period from the execution of the Lease through December 31, 2002. It is undisputed that Wilder owes the Conservancy $49,229.98 for these real estate taxes.

In the Purchase Agreement, Wilder agreed to "indemnify, defend and hold the Conservancy harmless from any loss or liability" relating to the representations and warranties contained therein. One of the representations and warranties was that "[n]o hazardous or toxic substance, material or waste, including without limitation asbestos, petroleum, or material containing or producing polychlorinated biphenyls (PCBs), is presently stored or located on the Property at levels greater than natural background concentrations." Wilder also represented and warranted that:

> There have not been and there are not now any underground or above ground storage tanks, septic tanks or wells located on or under the property or if there have been or are any such tanks or wells located on the property, their location has been identified to the Conservancy in writing, they have been properly registered with all appropriate authorities, they are in full compliance with all applicable statutes, ordinances and regulations, and they have not resulted in the release of any hazardous or toxic substance, material or waste into the environment.

Wilder did not identify in writing the existence and location of any underground storage tanks on the property and, in fact, affirmatively represented to the Conservancy that there were no such tanks.

In the Supplemental Agreement, Wilder agreed that at the end of the Lease term, it would clean up and properly dispose of any soil contaminated with diesel fuel, motor oil, herbicides/pesticides, or other agricultural chemicals, and any hazardous or toxic chemical substances or materials. Wilder also specifically agreed to remove all soil contaminated with diesel fuel that had leaked or spilled around two underground storage tanks identified as tanks 3 and 4 and inside a building identified as the Pump House. Wilder agreed that after it removed this contaminated soil from these areas, it would test the remaining soil to confirm that all contaminated soil had been removed. The parties dispute whether Wilder removed the contaminated soil from around tanks 3 and 4, but agree that it did not remove the contaminated soil from in the Pump House or conduct any post-removal testing.

The Conservancy brought this action against Wilder for breach of contract and has now moved for partial summary judgment. The matter is fully briefed, and this Order follows.

## DISCUSSION

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party may

meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Celotex, 477 U.S. at 324. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

There is no dispute that the various contracts and agreements at issue in this case are valid and enforceable. The Conservancy has brought this action alleging that Wilder did not complete its obligations under the agreements in three respects: (1) the sewage lagoons; (2) property taxes; and (3) underground storage tanks/petroleum contamination. Each of these will be addressed in turn.

I.      Sewage Lagoons

The Conservancy first argues that Wilder breached the contracts by failing to lawfully dispose of liquids and solids in the cattle sewage lagoons.  It is undisputed that the Supplemental Agreement required Wilder to dispose of the liquids and solids in and around the cattle sewage lagoons.  Specifically, Wilder agreed that, "[l]iquids and solids in and around the sewage lagoons on the Property shall be disposed of in compliance with all applicable statutes, ordinances, and regulations, including, if applicable, directives of the Illinois Environmental Protection Agency."  (Supplemental Agreement at ¶ 1.b.)  Although Wilder obtained several bids to complete this process and claims that it disposed of the liquids in these areas, it is undisputed that Wilder did not remove or dispose of the solids.

Wilder contends that it did remove the liquids from the cattle sewage lagoons.  In support of this contention, Wilder cites the testimony of Dan O'Brien ("O'Brien"), its farm and ranch division administrator.  O'Brien testified that while Wilder did not remove any solids from the sewage lagoons, it drained the sewage lagoons onto a field once in 2001. (O'Brien Dep. at 49-50)  As all factual issues must be construed in the light most favorable to the non-moving party, Wilder has met its burden of demonstrating a genuine issue of material fact with respect to the obligation to remove liquids from the sewage lagoons.

Wilder next argues that it did not breach its agreement, as it was not legally required to remove the solids under the applicable statutes and regulations.  O'Brien stated in his deposition that testing showed any remaining solids to have been uncontaminated dirt rather than manure, suggesting that Wilder's duty under the agreements applied only to manure. (O'Brien Dep. at 49-51)  That being said, Wilder has not pointed to any applicable legal authority drawing this distinction, and O'Brien admitted that there was nothing in ¶ 1.b.

of the Supplemental Agreement that limited Wilder's obligation to remove solids to just manure. Id. at 51.  Accordingly, Wilder's insinuation that the content of the solids excused any duty to dispose of them must be rejected.

The Conservancy takes the position that Wilder's obligation to dispose of the solids in the lagoons was not based on any statute, but was an unconditional duty based on the terms of the Supplemental Agreement itself.

> Wilder's obligation to dispose of the liquids and solids in the sewage lagoons, however, was not based on the Act. While the *manner* of disposal by Wilder had to be consistent with all applicable legal requirements, the *obligation to dispose* came from the Supplemental Agreement independent of any statutory requirement.

(Supplemental Agreement at 12)

It is important to note that the language of the Supplemental Agreement requires liquids and solids to "be disposed of in compliance with all applicable statutes, ordinances, and regulations . . . ."  The Conservancy's position assumes an "unambiguous and unconditional" duty to remove the solids that is independent from what is required by applicable legal authority.  If the Supplemental Agreement had stated something specifically to the effect that the liquids and solids "shall be removed and shall be disposed of in compliance with all applicable statutes . . ." then the Court might tend to agree. However, as written, such a duty is neither clearly nor unambiguously required under the terms of the Supplemental Agreement.  In fact, the word "remove" does not even appear in the portions of the document concerning the sewage lagoons.  Although logically, there must be a removal before there could be a disposal, the only reasonable construction of the plain language of this provision is that any contractual duty to remove and dispose of the solids from the sewage lagoons is as required by applicable statutes and regulations.

The question then becomes what conduct was required by applicable statutes and regulations. The Conservancy responds that the Livestock Management Facilities Act, 510 ILCS 77 *et seq.* (the "Act"), and the regulations promulgated thereunder at 8 Ill. Admin. Code § 900.608(a) (the "Code") required the complete emptying of the lagoons and the removal of an additional six inches of soil throughout. Specifically, the Act states that "[w]hen any earthen livestock waste lagoon is removed from service, it shall be completely emptied. Appropriate closure procedures shall be followed as determined by rule." 510 ILCS § 77/15(e). Section 900.608(a) of the Code then provides:

> (1) In the event that any livestock waste lagoon is removed from service, the requirements contained in Section 15(e) of the Livestock Management Facilities Act shall be met. The owner or operator shall notify the Department in writing when a lagoon is removed from service. Within 60 days after removal of the lagoon from service, the owner or operator shall submit a lagoon closure plan to the Department for review and approval. If no lagoon closure plan is received by the Department within 60 days, the Department shall send the lagoon owner a notice of default.
>
> (2) The lagoon closure plan shall provide for the following: (A) A location map of the lagoon and surrounding areas; (B) The sampling, analysis for total nitrogen, ammonium nitrogen, and phosphorus, and reporting of results of all remaining livestock waste, sludge and minimum six-inch thickness of soil from throughout the lagoon interior; (C) The removal of all remaining livestock waste including sludge, the removal of a minimum 6 inch thickness of soil from throughout the lagoon interior, and the application of these materials to crop land at agronomic rates as set forth in Subpart H of this Part or their otherwise proper disposal . . . .

Wilder suggests that there is an issue of fact as to whether the Act is applicable to this dispute, as the Act became effective on May 2, 1996, and there is some vague evidence that could promote an inference that Wilder's cattle operations may have ceased prior to that date. However, this argument consists of one paragraph, is devoid of any

citation to authority, and fails to acknowledge the language of 8 Ill. Admin. Code § 900.601(a)(3) applying § 900.608 to "any livestock waste lagoon" without any limitation as to time as is found with respect to several other sections in this category. This kind of perfunctory and undeveloped legal argument is utterly insufficient to survive a motion for summary judgment, and it is well-settled that responses of this type result in the waiver of the arguments. *See*, Finance Investment Co. v. Geberit AG, 165 F.3d 526, 1998 WL 890372, at *1 (7th Cir. Dec. 23, 1998) (finding a perfunctory and undeveloped argument to be waived); Volovsek v. Wisconsin Department of Agriculture, Trade and Consumer Protection, 344 F.3d 680, 689 n.6 (7th Cir. 2003); Indurante v. Local 705, International Brotherhood of Teamsters, 160 F.3d 364, 366 (7th Cir. 1998); Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 668 (7th Cir. 1998), cert. den., 119 S.Ct. 890 (1999). Accordingly, the Court finds that Wilder has waived its argument with respect to the applicability of the Act and its accompanying regulations.

Wilder next asserts that there is an issue of fact as to whether the lagoons were "removed from service," as the closure requirements of § 900.608 clearly apply only when a lagoon has been removed from service. Section § 900.608(b) then enumerates ways in which a lagoon is considered to have been removed from service. As there has been no reference made to an order from the Department of Agriculture or a written notification of removal from the owner, the most likely option would be removal from service when a lagoon "no longer receives livestock waste and the lagoon is not being serviced or maintained." 8 Ill. Admin. Code § 900.608(b)(3).

"Service" with respect to a lagoon is further defined as "that corrective action is taken as necessary to assure the integrity of the lagoon and its berm and associated

appurtenances, including but not limited to removal or repair of burrow holes, trees and woody vegetation, freeboard level, erosion, settling of berm, berm top maintenance, leaks, and seepage." 8 Ill. Admin. Code § 900.103.  Wilder cites O'Brien's testimony for the proposition that following the cessation of cattle activities on the property, Wilder personnel mowed and maintained the sewage lagoons for vegetation and argues that this creates an issue of fact as to whether the lagoons had been removed from service.

The Conservancy makes no specific argument to this contention, resting on its assertion that the duty to remove solids from the lagoons derives solely from the Supplemental Agreement and does not depend on the application of the Act.  As the Court has rejected this assertion, the Court has no alternative but to find that a genuine issue of material fact with respect to whether the sewage lagoons were removed from service and thereby triggered the closure requirements of § 900.608 precludes the entry of summary judgment on this claim.

    II.    <u>Real Estate Taxes</u>

Paragraph 3.a. of the Lease provides that Wilder "shall pay the Conservancy amounts equal to the real estate taxes which are due and payable during the lease term through December 31, 2002 . . . . " It is undisputed that the amount of real estate taxes due is $49,229.98 and that Wilder owes this amount to the Conservancy.  Wilder does not dispute this portion of the Motion and, in fact, offers no legal argument on this point in its Response.  Summary judgment is therefore granted in favor of the Conservancy on this issue.

### III. Underground Storage Tanks/Soil Contamination

Wilder admits that in the Purchase Agreement, it represented and warranted that "[n]o hazardous or toxic substance, material or waste, including without limitation asbestos, petroleum, or material containing or producing polychlorinated biphenyls (PCBs), is presently stored or located on the Property at levels greater than natural background concentrations." (Purchase Agreement at ¶ 15.c) Wilder further represented and warranted that:

> There have not been and there are not now any underground or aboveground storage tanks, septic tanks or wells located on or under the property or if there have been or are any such tanks or wells located on the property, their location has been identified to the Conservancy in writing, they have been property registered with all appropriate authorities, they are in full compliance with all applicable statutes, ordinances and regulations, and they have not resulted in the release of any hazardous or toxic substance, material or waste into the environment.

(Purchase Agreement at ¶ 15.d)

It is undisputed that Wilder did not identify the existence and location of any underground storage tanks on the property to the Conservancy in writing and, in fact, affirmatively represented that there were no underground storage tanks on the property. Nor does Wilder dispute the fact that there were in fact five underground storage tanks on the property when it was acquired by the Conservancy. Wilder's only response on this issue is the bald statement that the Conservancy was aware of at least two underground storage tanks (tanks 3 and 4), prior to closing on the sale; it provides no citation to legal authority or other legal analysis establishing that this fact somehow relieves it of its admittedly false representations or warranties. Again, at this stage of the proceedings, such a perfunctory and undeveloped argument has effectively been waived, and the

Conservancy is entitled to summary judgment on the issue of Wilder's breach on express warranties with respect to underground storage tanks on the property for whatever that is worth.

It would appear that the real substance of this issue involves the responsibility for clean-up and damages flowing from any contamination resulting from these unidentified tanks and other areas of concern. In the Supplemental Agreement, Wilder agreed that "at the end of the Lease term it would, in addition to all other provisions in the Lease, clean up and properly dispose of any soil contaminated with diesel fuel, motor oil, herbicides/pesticides, or other agricultural chemicals, and any hazardous or toxic chemical substances or materials." (Conservancy's Statement of Undisputed Fact ¶ 30) Wilder also specifically agreed to "remove all soil contaminated with diesel fuel that had leaked or spilled around two underground storage tanks identified as tanks 3 and 4 and inside a building identified as the Pump House" and following the removal to "test the remaining soil to confirm that all contaminated soil had been removed." (Id. at ¶¶ 32 and 33) Wilder concedes that it breached its agreements with respect to the Pump House, but disputes the remainder of this claim.

Wilder argues that as to the underground storage tanks 3 and 4, it took action to remove the contaminated soil. In support of this position, Wilder cites page 118 of O'Brien's deposition testimony, which contains the following excerpt:

> Q. Wilder did not do any remediation at the area identified as Exhibit A-2 on Exhibit 33, correct?
>
> A. If he did, he took a scoop out. There wasn't much there, if anything.
>
> Q. Did you do anything with the underground storage tanks?

   A.  Oh, no.

(O'Brien Dep. at 118)  Whether this actually supports the assertion that Wilder took action to remediate the soil around tanks 3 and 4 is far from clear.

  In June 2000, the IEPA performed an inspection of the property, resulting in the issuance of a violation notice.  Although this notice did not specifically reference the contamination around tanks 3 and 4, Wilder claims that following its receipt of this notice, it did substantial work that apparently included removing "a scoop" of soil near underground storage tanks 3 and 4.  On October 19, 2000, the IEPA conducted a follow-up inspection and subsequently notified Wilder that it had "returned to compliance with the apparent violations . . . " again never making any specific reference to the area around storage tanks 3 and 4.  Wilder asserts that it received a similar "release" from the Conservancy on December 7, 2000, where the Conservancy wrote that spills in the dispensing area "appear to have been remedied."

  However, the Conservancy responds that the items for which Wilder received releases are not the same violations that are the subject of its claims in this case and that the statement was based on the information that the Conservancy had at the time.  The Supplemental Agreement also required Wilder to do follow-up testing to determine that all contaminated soil had been removed, but Wilder admits that such testing was never done. The Conservancy then conducted its own sampling in that area, determined that there was still contamination remaining, and notified Wilder of its findings.

  Wilder's suggestion that the statements made by the IEPA and the Conservancy somehow released it from any further obligation under the Supplemental Agreement is

unsupported by any legal argument or citation to authority. Thus, it is another perfunctory and undeveloped argument that the Court deems waived.

Moreover, a release is "a contract wherein a party abandons a claim to a person against whom the claim exists" and must be analyzed under the law of contracts. <u>Polo National Bank v. Lester</u>, 183 Ill.App.3d 411, 414 (2nd Dist. 1989). As such, the intention of the parties must be determined from the instrument itself. <u>Farm Credit Bank of St. Louis v. Whitlock</u>, 144 Ill.2d 440, 447 (Ill. 1991). Assuming that the reference in the Conservancy's December 7, 2000, letter is intended to address the contamination around storage tanks 3 and 4, Wilder has made no effort to demonstrate that it constitutes a legally valid and enforceable release as a matter of law or that it had any legal basis for reasonably assuming that it had been released. To the contrary, on the record before the Court, the reference in the December 7, 2000, letter falls far short of establishing any intention by the Conservancy to abandon its claim with respect to Wilder's duties under ¶¶ 1.c and 4 of the Supplemental Agreement.

While Wilder may have raised an issue of fact with respect to whether it removed some of the contaminated soil from around storage tanks 3 and 4, that dispute is immaterial. Given Wilder's admitted failure to conduct the post-removal testing required under the Supplemental Agreement, the Conservancy's unrefuted evidence indicating that its testing revealed that contaminated soil remained in these areas, and Wilder's agreement that the Conservancy was authorized to complete any of Wilder's unfulfilled obligations in this respect and deduct the cost from the amount withheld at closing, the Court finds as a matter of law that the Conservancy is entitled to summary judgment as to liability on its

claims for breach of contract with respect to the petroleum contamination around storage tanks 3 and 4.

## CONCLUSION

For the reasons set forth herein, Plaintiff's Motion for Partial Summary Judgment [#2] is GRANTED IN PART and DENIED IN PART.  The Motion is granted with respect to the Conservancy's claims regarding: (1) unpaid real estate taxes; (2) liability for breach of express warranties that there were no underground storage tanks; and (3) liability for breach of contract with respect to petroleum contamination.  The Motion is denied in all other respects.  This matter remains set for final pretrial conference at 1:00 p.m. on January 25, 2008.

ENTERED this 28th day of December, 2007.

s/ Michael M. Mihm<br>
Michael M. Mihm<br>
United States District Judge