**E-FILED**
Thursday, 28 May, 2009  09:51:03 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS

THE NATURE CONSERVANCY,     )
                                     )
           Plaintiff,      )
                                     )
         v.                )        Case No. 06-1096
                                     )
WILDER CORPORATION OF      )
DELAWARE,                 )
                                     )
         Defendant.    )

# O R D E R

    This matter is before the Court on Plaintiff's Second Motion for Partial Summary Judgment. For the reasons set forth below, Plaintiff's Second Motion for Partial Summary Judgment [#55] is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

    Plaintiff, The Nature Conservancy (the "Conservancy"), entered into an agreement dated February 22, 2000, with Defendant, Wilder Corporation of Delaware ("Wilder") (hereinafter referred to as the "Purchase Agreement"). Pursuant to the Purchase Agreement, Wilder agreed to sell the Conservancy 6,660 acres of land, together with buildings and improvements, in Fulton County, Illinois, for $16,350,000.00. The Conservancy purchased this property for use as a nature preserve. The Purchase Agreement was subsequently amended by an Amendment to Purchase Agreement dated March 7-8, 2000 (the "Amendment"). As provided in the Purchase Agreement, upon closing the Conservancy leased the property back to Wilder via a lease dated April 21, 2000 (the "Lease").

Pursuant to the terms of the Purchase Agreement, Wilder was required to remove all rubbish, trash, and hazardous or toxic chemical substances or materials, including petroleum, on the Property prior to closing.  Wilder wanted to close the sale of the property on or before May 1, 2000, prior to meeting all of its obligations under the Purchase Agreement.  The Conservancy agreed to close the purchase prior to Wilder's cleaning up any rubbish, trash, and hazardous or toxic chemical substances or materials on the property in consideration for the agreements made by Wilder as memorialized in a supplemental agreement dated April 24-25, 2000 (the "Supplemental Agreement").

Under the Supplemental Agreement, the Conservancy withheld $75,000.00 from the purchase price contingent upon Wilder completing its obligations by August 1, 2000.  If Wilder did not complete its obligations by that time, the Conservancy was entitled to complete those obligations and deduct the cost from the $75,000.00 withheld.  With the exception of the payment of the $75,000.00, Wilder agrees that the Conservancy has performed all conditions to be performed by it under the Purchase Agreement, the Amendment, the Lease, and the Supplemental Agreement.

Wilder and others conducted a cattle operation on the property involving 5,000 - 6,000 head of cattle.  Sewage lagoons were maintained on the property to handle the waste generated by the cattle.  These lagoons were lagoons as defined in Section 10.25 of the Livestock Management Facilities Act, 510 ILCS 77/10.25 and the Livestock Management Facility Regulations promulgated by the Illinois Department of Agriculture as 8 Ill. Admin. Code § 900.103, and Wilder neither sought nor obtained a waiver of the requirements under 510 ILCS 77/15(e) or 8 Ill. Admin. Code § 900.608(a).

Pursuant to the Supplemental Agreement, Wilder specifically agreed to dispose of all liquids and solids in and around the sewage lagoons on the property in compliance with all legal requirements.  In June and August 2001, Wilder obtained several bids to clean out the material in the sewage lagoons ranging from $230,200.00 to $450,000.00.   Wilder admits that it did not dispose of the solids in and around the sewage lagoons on the property, but argues that it did dispose of the liquids.  However, Wilder admits that the net cost to the Conservancy for the disposal of the liquids and solids in and around the sewage lagoons on the property was $274,888.82.

The Lease required Wilder to pay the real estate taxes due for the period from the execution of the Lease through December 31, 2002.  It is undisputed that Wilder owes the Conservancy $49,229.98 for these real estate taxes.

In the Purchase Agreement, Wilder agreed to "indemnify, defend and hold the Conservancy harmless from any loss or liability" relating to the representations and warranties contained therein.  One of the representations and warranties was that "[n]o hazardous or toxic substance, material or waste, including without limitation asbestos, petroleum, or material containing or producing polychlorinated biphenyls (PCBs), is presently stored or located on the Property at levels greater than natural background concentrations."  Wilder also represented and warranted that:

> There have not been and there are not now any underground or above ground storage tanks, septic tanks or wells located on or under the property or if there have been or are any such tanks or wells located on the property, their location has been identified to the Conservancy in writing, they have been properly registered with all appropriate authorities, they are in full compliance with all applicable statutes, ordinances and regulations, and they have not resulted in the release of any hazardous or toxic substance, material or waste into the environment.

- 3 -

Wilder did not identify in writing the existence and location of any underground storage tanks on the property and, in fact, affirmatively represented to the Conservancy that there were no such tanks.

In the Supplemental Agreement, Wilder agreed that at the end of the Lease term, it would clean up and properly dispose of any soil contaminated with diesel fuel, motor oil, herbicides/pesticides, or other agricultural chemicals, and any hazardous or toxic chemical substances or materials. Wilder also specifically agreed to remove all soil contaminated with diesel fuel that had leaked or spilled around two underground storage tanks identified as tanks 3 and 4 and inside a building identified as the Pump House. Wilder agreed that after it removed this contaminated soil from these areas, it would test the remaining soil to confirm that all contaminated soil had been removed. The parties dispute whether Wilder removed the contaminated soil from around tanks 3 and 4, but agree that it did not remove the contaminated soil from in the Pump House or conduct any post-removal testing.

The Conservancy brought this action against Wilder for breach of contract. On December 28, 2007, the Court granted in part and denied in part the Conservancy's prior Motion for Partial Summary Judgment. The Motion was granted with respect to the Conservancy's claims that: (1) Wilder was liable for unpaid real estate taxes; (2) Wilder was liable for breach of express warranties that there were no underground storage tanks; and (3) Wilder was liable for breach of contract with respect to petroleum contamination around storage tanks 3 and 4. The Court rejected the Conservancy's contract argument and found genuine issues of material fact with respect to whether sewage lagoons were removed from service, thereby triggering the requirements of 8 Ill. Admin. Code § 900.103.

The Court subsequently reopened discovery, allowed the Conservancy to amend its complaint to seek relief for additional areas of alleged contamination, and granted Defendant's request to file counterclaims for certain set offs. The Amended Complaint added allegations that Wilder had failed to clean up contaminated soils around the former site of an aboveground storage tank ("AST") south of the Pump House and that this contamination also constituted a breach of Wilder's warranty that no petroleum was located on the property in greater than natural background concentrations. The Conservancy has now filed its Second Motion for Partial Summary Judgment. The matter is fully briefed, and this Order follows.

## DISCUSSION

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial.  Celotex, 477 U.S. at 324.  Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]."  Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989).  Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

There is no dispute that the various contracts and agreements at issue in this case are valid and enforceable.  The Conservancy has brought this Motion alleging that Wilder did not complete its obligations under the agreements in three respects: (1) liability and damages for the cost of cleaning out the sewage lagoons; (2) damages for remediating petroleum contamination associated with underground storage tanks; (3) liability and damages for remediating petroleum contamination associated with the AST south of the Pump House; and (4) liability and damages for the cost of cleaning up trash, rubbish, and junk on the Property.  Each of these will be addressed in turn.

      I.    Sewage Lagoons

The Court previously rejected the Conservancy's argument that Wilder had an unconditional duty to remove waste from the sewage lagoons based on the terms of the Supplemental Agreement itself, finding instead that any contractual duty to remove and dispose of the solids from the sewage lagoons is only as required by applicable statutes and regulations; this would also include directives issued by the IEPA.  The Court then found a genuine issue of material fact as to whether the lagoons had been removed from

- 6 -

service, as is required to trigger the removal and disposal requirements of 510 ILCS § 77/15(e) and 8 Ill.Admin.Code § 900.608(a).

The Conservancy is now back for a second bite at this apple, asserting a new basis for contractual liability supported by correspondence with the IEPA and alleging that it incurred damages in the amount of $274,888.82 in disposing of the liquids and solids from the sewage lagoons on the Property. The Conservancy again attempts to bring the claim within the duties owed under the contracts, namely § 1.b., which provides:

> Liquids and solids in and around the sewage lagoons on the Property shall be disposed of in compliance with all applicable statutes, ordinances, and regulations, including, if applicable, directives of the Illinois Environmental Protection Agency.

Relying on certain communications from the IEPA in 2001 and 2002, the Conservancy argues that these communications are "directives" under the terms of the Supplemental Agreement.

Correspondence dated January 8, 2001, notes that a routine inspection of the Property discovered some "apparent violations." The IEPA specifically stated that this was not a Violation Notice but requested written response outlining the action Wilder intended to take to correct and prevent recurrence of the apparent violation. The correspondence also provided a list of recommendations for dealing with the identified issues. Both Wilder and the Conservancy responded to the January 8, 2001, letter. On May 14, 2001, the IEPA responded that the letter they received from Wilder "does not indicate they will complete the recommendations outlined in our January 8 letter. We feel these items need to be completed as part of the overall site remediation. Please advise us as to whether you or Wilder will complete this work and by what date(s)." Wilder responded with a letter dated May 24, 2001, expressing its view that appropriate steps had been taken to correct

the identified issues.  In July 2001, the IEPA apparently came to the site and discussed the

issues with personnel from the Conservancy and Wilder.  A July 23, 2001, letter from the

IEPA summarizing the discussion from that meeting stated:

> All wastewater, manure, and sludge will be removed from the
> following areas:
>
> -      All lagoons and impoundments, including the
>        northwest lagoon, northeast lagoon, south
>        lagoon, recycle lagoon, and waste collection
>        sump . . .
>
> Every effort will be made to land apply and incorporate
> manure/sludge as it is removed.  However, solid waste/sludge
> may be stockpiled northeast of the feedlot as long as there is
> no runoff and all incorporation work is completed on or before
> December 15, 2001. . . .
>
> The Nature Conservancy will properly backfill and abandon the
> lagoons by December 31, 2001, or as soon as possible in early
> 2002 under coordination with Illinois Department of Agriculture.

Wilder responded to this letter with correspondence dated September 7, 2001,

indicating that Wilder had "pumped all of the water out of the lagoons and ditches" and

were obtaining bids on the lagoon removal project.  A November 9, 2001, letter from Wilder

then indicated that after the lagoons were drained, testing results had indicated that the

material in the lagoons was not an environmental hazard and sought clarification as to why

the non-hazardous material needed to be removed.  On January 8, 2002, the IEPA clarified

that the waste and sludge must be removed prior to backfilling or it could make the site

subject to the Division of Land Pollution Control 815 rules for on-site landfills.  Furthermore,

James Kammueller ("Kammueller"), the Regional Manager of the IEPA's Peoria Office,

stated in his deposition that the IEPA has a duty to follow up on apparent violations and

determine that work will be done to correct them.  (Kammueller Dep. at 10)

Wilder attempts to distinguish these letters with the argument that none of them conclude that there has been an actual violation of the law. However, this argument misses the point that is being asserted in the Conservancy's new claim of liability based on contractual obligation, as the language in the Supplemental Agreement requires that Wilder dispose of the liquids and solids in and around the lagoons on the Property not only in compliance with applicable statutes, ordinances, and regulations, but also in compliance with the "directives" of the IEPA and does not specifically require an actual "violation" in order for the duty to kick in. As the term "directive" is not defined in either the Supplemental Agreement, statute, or regulations, the Court must turn to its plain and ordinary meaning. The dictionary definition of "directive" is "serving or intended to guide, govern, or influence; serving to point direction." Merriam-Webster Dictionary, http://www.merriam-webster.com. The statements made in the above-referenced communications from the IEPA clearly satisfy this standard, and the Court must reject Wilder's assertions to the contrary.

Wilder also urges the Court to find that the material in the bottom of the lagoons did not constitute "solids" under the Supplemental Agreement, suggesting that the term only referred to contaminated soil. However, the Court previously rejected this argument in its December 28, 2007, Order, finding as a matter of law that there was nothing in the Supplemental Agreement that limited Wilder's obligation to manure or solids that were deemed "contaminated." Wilder has not presented any credible basis for reconsidering the Court's finding in this respect, and it is clear from the IEPA correspondence dated January 8, 2002, that the agency did not consider this distinction to be relevant to its directive that the material must be removed.

Thus, the Court finds as a matter of law that the cited correspondence from the IEPA to Wilder and the Conservancy constituted "directives" within the meaning of § 1.b. of the Supplemental Agreement.  Wilder was therefore contractually obligated to remove the solids in and around the lagoons and dispose of them in compliance with all applicable statutes, ordinances and regulations, including the IEPA directives, and the Conservancy is entitled to summary judgment to that effect.

II.     <u>Petroleum Contamination</u>

The Conservancy seeks a finding that Wilder is liable for the costs of cleaning up petroleum contamination at five underground storage tanks, the Pump House, and the ASTs pursuant to the representations and warranties it made in the Purchase Agreement. Wilder admits that in the Purchase Agreement, it represented and warranted that "[n]o hazardous or toxic substance, material or waste, including without limitation asbestos, petroleum, or material containing or producing polychlorinated biphenyls (PCBs), is presently stored or located on the Property at levels greater than natural background concentrations."  (Purchase Agreement at ¶ 15.c)  Wilder further represented and warranted that:

> There have not been and there are not now any underground or aboveground storage tanks, septic tanks or wells located on or under the property or if there have been or are any such tanks or wells located on the property, their location has been identified to the Conservancy in writing, they have been property registered with all appropriate authorities, they are in full compliance with all applicable statutes, ordinances and regulations, and they have not resulted in the release of any hazardous or toxic substance, material or waste into the environment.

(Purchase Agreement at ¶ 15.d)     In the Supplemental Agreement, Wilder also agreed that "at the end of the Lease term it would, in addition to all other provisions in the Lease, clean

up and properly dispose of any soil contaminated with diesel fuel, motor oil, herbicides/pesticides, or other agricultural chemicals, and any hazardous or toxic chemical substances or materials."

The Court previously held that the Conservancy was entitled to summary judgment on Wilder's breach of express warranties with respect to underground storage tanks 3 and 4 on the Property. Wilder conceded that it breached its agreements with respect to "remov[ing] all soil contaminated with diesel fuel that had leaked or spilled" inside a building identified as the Pump House" and "test[ing] the remaining soil to confirm that all contaminated soil had been removed." The Court further found that given Wilder's admitted failure to conduct the post-removal testing required under the Supplemental Agreement, the Conservancy's unrefuted evidence indicating that its testing revealed that contaminated soil remained in these areas, and Wilder's agreement that the Conservancy was authorized to complete any of Wilder's unfulfilled obligations in this respect and deduct the cost from the amount withheld at closing, the Conservancy was entitled to summary judgment as to liability on its claims for breach of contract with respect to the petroleum contamination around underground storage tanks 3 and 4.

The Conservancy asks the Court to grant summary judgment as to liability with respect to the Pump House. However, this finding was already made in on page 12 of the December 28, 2007, Order, where the Court noted "Wilder concedes that it breached its agreements with respect to the Pump House" and on page 15, where the Court granted summary judgment in favor of the Conservancy as to liability for breach of contract with respect to petroleum contamination. Accordingly, summary judgment as to liability regarding the Pump House contamination need not be re-entered here.

The Conservancy next seeks to expand these rulings to apply to petroleum contamination around all other storage tanks, above ground and below, based on Wilder's alleged breach of the same warranties. Although the briefing on this issue is not as clear as the Court would have hoped, it would appear that these new areas of contamination are in connection with underground storage tank 2 and also in an area that is referred to as south of the Pump House. The Court sees no reason why the Court's prior ruling with respect to Wilder's liability for damages in connection with underground tanks 3 and 4 should not also apply to underground tank 2. Wilder conceded that it breached its duty to identify the existence and location of any underground storage tanks to the Conservancy in writing as required and, in fact, affirmatively represented to the Conservancy that there were no underground storage tanks on the Property. Wilder is therefore liable for breach of its express warranty with respect to underground storage tank 2, as well.

Wilder responds that the claim for the area south of the Pump House is not only based on speculation, but also barred by its affirmative defenses. In order to prevail on this claim, the Conservancy must demonstrate that the contamination south of the Pump House was present either on April 25, 2000, the date of closing, or December 2002 when Wilder left the leasehold. A review of the record reveals the following evidence. Mark Jones ("Jones"), a former Wilder employee, stated in his deposition that there were three aboveground tanks in the area south of the Pump House that supplied the diesel fuel for the Pump House (Jones Dep. at 15-16) These tanks were only used until 1995. Id. Any fuel that remained at that time was pumped back out for other uses. Id., at 16-17. Kevin Blodgett ("Blodgett"), an employee of the Conservancy, testified in his deposition that there was a general consensus between the Conservancy and its contractors that the

contamination in this area came from a pipeline that was going to the Pump House from the three aboveground tanks. (Blodgett Dep., at 49-50) This contamination was not found during the Conservancy's environmental assessment in 2000 because the contamination was subsurface and that assessment did not include any analysis of the subsurface area. Id.  Although the tanks were physically present when the Conservancy did its assessment in 2000, and the Conservancy was aware of the existence of both the tanks and the pipeline, they made the decision not to sample the soil around those tanks during the assessment because they say no significant evidence of any problems.  Id., at 51.  The contamination was discovered in May or June 2007, when samplings were done in connection with cleaning up the underground storage tanks and area around the Pump House, and the samplings indicated that the concentration of contaminants increased as they got further away from the Pump House.  Id., at 47-48.

While the evidence does not conclusively identify the source of the alleged contamination or the time period in which the contamination occurred, the testimony of Jones and Blodgett promotes a reasonable inference that the contamination came from the aboveground tanks and pipeline that supplied the Pump House with diesel fuel. Furthermore, Jones' testimony that Wilder stopped pumping diesel fuel from the tanks to the Pump House in 1995 and that any remaining fuel was drained at that time promotes the uncontradicted inference that this contamination had occurred no later than 1995 and was therefore present on the land prior to the closing on the Purchase Agreement in 2000 and Wilder's departure from the leasehold in December 2002.

Wilder has introduced the affidavit of Daniel O'Brien, Wilder's Farm and Ranch Division Administrator, in which he indicates that there were other lessees on the Property

after Wilder vacated in December 2002.  (O'Brien Aff., at ¶ 19)  Although Wilder speculates that the pollution may have been caused by another lessee after it left the leasehold, it has not introduced any underlined evidence of who these lessees were, that any of these lessees did anything on the property involving petroleum, or that there was any other likely source of this contamination that is sufficient to pose a genuine issue of material fact.  Resting on supposition at this stage of the litigation is insufficient.  "The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party."  Delta Consulting Group, Inc. v. R. Randle Construction, Inc., 554 F.3d 1133, 1137 (7th Cir. 2009). Accordingly, the only reasonable inference that could properly be drawn on the record now before the Court is that the contamination was caused by leaks from the aboveground tanks or pipeline.  As the record establishes that these were taken out of service in 1995 and any remaining petroleum/fuel was pumped out of them at that time, it is also reasonable to infer that any contamination occurred long before Wilder's departure.

Wilder decries the Conservancy's case as speculation and conjecture, yet offers nothing more than speculation and conjecture itself.  As the Conservancy has produced evidence from which a reasonable jury could find Wilder liable for the contamination in the area south of the Pump House, and Wilder has failed to introduce evidence that would promote a reasonable inference to the contrary, the Court finds no genuine issue of material fact requiring resolution at trial in this respect.

Wilder then argues that the Conservancy's clean up of this area was not required by law, but rather was voluntary.  This argument is a red herring.  Wilder warranted that there were no undisclosed storage tanks on the Property and that any such tanks had not

resulted in the release of any hazardous or toxic substance into the environment.  In the Supplemental Agreement, Wilder further agreed to clean up and properly dispose of any soil contaminated with diesel fuel, motor oil, etc.   Kenn Liss ("Liss"), one of the environmental consultants hired by the Conservancy, stated in his deposition that testing determined that there was free product and contamination in this area.  (Liss Dep. at 38-39)  Although Liss also stated that the Conservancy was not under any legal obligation to remediate this area, Wilder's obligations in the Supplemental Agreement were very broad and clearly did not limit its duty to "clean up and properly dispose of any soil contaminated with diesel fuel, motor oil, herbicides/pesticides, or other agricultural chemicals, and any hazardous or toxic chemical substances or materials" to only the areas where immediate remediation was required by a statute or regulation.  Where the language of the contract is clear and unambiguous, the Court will not strain to construe the language as if it contained an additional limiting term that would change the plain meaning of the contract provision in the manner suggested by Wilder.

Finally, Wilder argues that the Conservancy's claim regarding the area south of the Pump House has been waived as a result of the Conservancy's failure to discover it during its 2000 environmental inspection and assessment.  Paragraph 14 of the Purchase Agreement reserved to the Conservancy the right to inspect the property for hazardous or toxic substances and, if found, the Conservancy could either refuse to accept the property or require Wilder to correct the problem.  The parties entered into the Supplemental Agreement in April 2000, after the Conservancy had completed its environmental inspection of the Property.  Although the Conservancy discovered hazardous or toxic chemical substances on the Property that it could have required Wilder to clean up prior

to closing, the Conservancy agreed to close on the sale prior to the clean up, and Wilder agreed to clean up a list of specified items, including five specified areas of petroleum contamination.  Wilder maintains that because the Conservancy had the opportunity to conduct an environmental inspection and did so, it is barred from seeking or recovering for anything beyond the scope of the contamination specifically identified in the Supplemental Agreement.  Accordingly, Wilder contends that the Conservancy has waived any claim to recover for contamination that it failed to discover in its own inspection, such as the area south of the Pump House.

Waiver is "the voluntary and intentional relinquishment of a known right."  Delta Consulting, 554 F.3d at 1140.  As there was clearly no express waiver in this case, any waiver would have to be implied from the conduct, actions, or words of the Conservancy.  Id.

> An implied waiver may arise where a person against whom the waiver is asserted has pursued such a course of conduct as to sufficiently evidence an intention to waive a right or where his conduct is inconsistent with any other intention than to waive it. . . . Although waiver may be implied, the act relied on to constitute the waiver must be clear, unequivocal and decisive.

Id.

Here, Wilder correctly notes that the Conservancy's environmental examination uncovered certain areas of contamination that were specifically set forth in the Supplemental Agreement as items that were to be remediated by Wilder by a certain date. If the Supplemental Agreement merely stated these things, then the Court would agree that there had been a clear and unequivocal waiver by the Conservancy.  However, these obligations were set forth in ¶ 1 of the Supplemental Agreement, and ¶ 4 does not refer back to ¶ 1 or otherwise indicate that it is limited to just the enumerated instances of

- 16 -

contamination and provides that at the end of the lease term, Wilder will "clean up and properly dispose of any soil contaminated with diesel fuel, motor oil, herbicides/pesticides, other agricultural chemicals, and any hazardous or toxic chemical substances or materials." In other words, there plain language of ¶ 4 does not limit its application to the specific instances listed in ¶ 1.a. through ¶ 1.e.   Paragraph 8 then provides that Wilder's hold harmless agreement against "any and all liability arising from the existence  or use of . . . petroleum . . . shall survive the closing and the expiration of the Lease term."

Wilder contends that the absence of specific language in the agreements stating that items not discovered during the environmental inspection may still be pursued indicates an intentional relinquishment of the Conservancy's right to pursue such claims. However, the Court finds that the issue must be resolved from the opposite perspective. The language in ¶¶ 4 and 8 of the Supplemental Agreement contains no language limiting the scope of the agreement only to items discovered during the environmental inspection and indicates a much broader application.  If it was the intent of the parties to limit Wilder's exposure to simply remediating the contamination that was specifically identified at that time, then language should have been included to reflect and unequivocally evidence the intended limitation.   Absent such language, the Court finds no evidence of a clear, unequivocal, or decisive act by the Conservancy contradicting the plain language of the Supplemental Agreement or relinquishing its right to seek redress for additional violations. Accordingly, Wilder's waiver theory must be rejected.

Alternatively, Wilder asserts that the Conservancy's claim is barred by laches.   The equitable doctrine of laches bars a plaintiff from pursuing a claim if the plaintiff unreasonably delayed filing the suit and the defendant is harmed as a result.  Pruitt v. City

of Chicago, Illinois, 472 F.3d 925, 927 (7th Cir. 2006).  Stated another way, laches has is "the neglect or omission to assert a right which taken in conjunction with a lapse of time and circumstances causing prejudice to the opposite party, will operate as a bar to suit." Bill v. Board of Education of Cicero School Dist. 99, 812 N.E.2d 604, 610 (1st Dist. 2004). "This defense 'requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" Pruitt, 472 F.3d at 927; Roberts & Schaefer Company v. Director, Office of Workers' Compensation Programs, 400 F.3d 992, 997 (7th Cir. 2005).

Here, approximately seven years passed between the Conservancy's environmental inspection and entry into the various agreements and the addition of the claim for the remediation of petroleum contamination in the area south of the Pump House.  Wilder argues that it relied on the results of the Conservancy's inspection and is not responsible if the inspection that was conducted was not thorough or complete.  Wilder takes the position that the lengthy delay is indicative of a lack diligence by the Conservancy and that it is unreasonable to expect Wilder to be responsible for the costs of remediating an area that was not brought to their attention at the time of the inspection.  This delay is claimed to have prejudiced Wilder by causing evidence to become stale and making it virtually impossible to conclusively determine the cause of the contamination or the extent to which the contamination existed during its time on the Property.

The Conservancy failed to make any substantive response to this argument, focusing on the waiver defense without really addressing the substance of the laches defense.  During oral argument, the Conservancy was given a chance to supplement its response on this question, during which time it took the position that laches should not be

used to cut short a claim brought within the statute of limitations and that applying the doctrine of laches in a case where only monetary damages are claimed would essentially allow Wilder to avoid contractual obligations.  The parties were then given the opportunity to provide supplemental citations to authority on this issue.

The Court rejects the Conservancy's argument with respect to the application of laches within the statute of limitations.  In Maksym v. Loesch, 937 F.2d 1237, 1248 (7th Cir. 1991), the Seventh Circuit concluded that the Illinois Supreme Court would find that the fact that a suit is brought within the statutory period would not defeat a laches defense. *See also,* Bill, 812 N.E.2d at 613 (noting that Illinois courts "have often invoked the laches doctrine in contravention to the ordinary limitations period which would apply by statute.") Otherwise, there would be no need for the application of a laches defense, as it would only be available in cases where the suit was already barred for having been filed outside the statute of limitations.

This brings us to the Conservancy's assertion that laches cannot be applied to defeat an action for damages.  In Maksym, the Seventh Circuit recognized that the great weight of authority in Illinois holds that laches is a defense only in equity cases.  937 F.2d at 1248, *citing* People ex rel. McCoy v. Sherman, 462 N.E.2d 817 (1984); Mother Earth, Ltd. v. Strawberry Camel, Ltd., 390 N.E.2d 393 (1979).  The Conservancy also cites Bays v. Matthews, 440 N.E.2d 142, 145 (5th Dist. 1982), and People v. Sherman, 462 N.E.2d 817, 819 (4th Dist. 1984), for the proposition that laches is "primarily an equitable defense." The Bays case, however, then notes that numerous exceptions have been forged to allow the defense in cases at law, such as ejectment, mandamus, certiorari, quo warranto, and declaratory judgment.  Id.

Wilder cites to the opinion in <u>Bill</u>, which notes that a mechanical application of the distinction between law and equity is no longer followed, referencing the application of laches to "equity-like" actions where equitable considerations are at the heart of a claim actually based on law.  812 N.E.2d at 612.   In <u>Bill</u> and <u>Lee v. City of Decatur</u>, 627 N.E.2d 1256, 1259 (4th Dist. 1994), and <u>Summers v. Village of Durand</u>, 653 N.E.2d 272, 276 (2nd Dist. 1994), which were also cited by Wilder, the Illinois Appellate Courts applied the doctrine in cases for breach of an employment contract.  However, the basis for allowing a laches defense in these cases is the request for reinstatement or monetary damages for back pay, both of which are quasi-equitable remedies rather than purely money damages. *See* <u>Maksym</u>, 937 F.2d at 1248.  Even <u>Szymanski v. Glen of South Barrington Property Owners Association</u>, 689 N.E.2d 272, 274 (1st Dist. 1997), in which homeowners sought money damages from members of their homeowners' association board, the action was based on quasi-equitable claims of breach of fiduciary duty and sought relief for diminution in the value of their homes based on the board's alleged failure to enforce the association's restrictive covenants.

None of the cases cited by either party support a finding that Illinois courts would condone the application of a laches defense in a pure case at law such as this, that is a breach of contract case seeking nothing but money damages.  This was recognized by the Seventh Circuit in <u>Maksym</u>, where the Court of Appeals found that although laches was increasingly applied in cases at law seeking damages, the great weight of law in Illinois is to the contrary and precludes the application of a laches defense in suits that seek only money damages.  <u>Id.</u>  Thus, although the Court finds that applying laches to bar the Conservancy from recovering damages in this area as a result of its delay would be the

"right" outcome in equity, it would not be the legally correct result.  As the Court is bound to follow the applicable legal precedent in this diversity case, the Court must reject Wilder's laches defense as unavailable under the facts and circumstances of this case.  Finding no issues of material fact from which a reasonable jury could find in favor of Wilder on this claim, the Court therefore concludes that the Conservancy is entitled to summary judgment on this claim as well.

III.    Rubbish, Trash, and Junk

It is undisputed that the terms of the Purchase Agreement and Supplemental Agreement required Wilder to clean up rubbish and trash on the Property.  It is also undisputed that Wilder failed to do so.  Thus, the Conservancy is entitled to judgment as a matter of law on this claim.

IV.    Damages

Wilder's responsibility for $49,229.98 in unpaid real estate taxes was established in the Courts December 28, 2007, Order.  Wilder also concedes responsibility for the $2,265.00 paid by the Conservancy to clean up the rubbish and trash on the Property.

The Conservancy states that it spent $274,888.82 to clean up the sewage lagoons after Wilder failed to do so as required by ¶ 1.b. of the Supplemental Agreement.  Wilder does not dispute that the Conservancy spent this amount on the clean up, and does not challenge the figure in its response or sur-reply.    Paragraph 6 of the Supplemental Agreement provides that should Wilder fail to complete any of its obligations in ¶¶ 1.a. through 1.e.,  the Conservancy is entitled to complete the work and deduct the cost from the $75,000.00 withheld at closing.  In ¶ 8, Wilder further agreed to indemnify and hold harmless the Conservancy against any and all liability arising from the existence or use of

hazardous or toxic substances, materials, or wastes on the Property.  As Illinois law provides that the amount that will compensate the injured party for the loss incurred as a result of the breach of contract is the proper measure of damages, the Court finds that the Conservancy is entitled to $274,888.82 for the costs of cleaning up the sewage lagoons. LeFevour v. Howorka, 224 Ill.App.3d 428, 429 (1st Dist. 1991).

An additional $264,315.68 is sought for removing and remediating contamination associated with underground storage tanks and the Pump House.  The Court's December 28, 2007, Order only granted summary judgment as to liability for the contamination arising from underground tanks 3 and 4, as well as the Pump House.  Wilder objects that the figure claimed includes costs incurred in remediating an area around tank 2, which was not part of the Court's Order.  However, the Court has now found that Wilder is liable for the costs of remediating underground tank 2, and the Conservancy is entitled to $264,315.68 for costs incurred in remediating the underground storage tanks on the Property.

The Conservancy seeks $300,823.73 for the cost to remediate contamination soil and free product in the area south of the Pump House.  Wilder again objects to the damages sought because the clean-up was "voluntary," and it has not been proven with precision how much of the contamination existed during its time on the property.  These objections are overruled for the reasons set forth previously in this Order.  Wilder further objects to $7,636.00 for a levee evaluation cost, $1,923 for electricity to run a pump, and almost $5,000 in "guestimated" future costs as unexplained and unsubstantiated.  The Conservancy's only response is that this criticism is insufficient to raise an issue of fact. The Court disagrees, and finds that if the Conservancy wishes to recover these amounts, it will have to prove that they are entitled to them.  Summary judgment is therefore denied

in part with respect to the $14,559 in disputed amounts in the Conservancy's claim for damages related to cleaning up the contamination south of the Pump House.

## CONCLUSION

For the reasons set forth herein, Plaintiff's Second Motion for Partial Summary Judgment [#55] is GRANTED IN PART and DENIED IN PART.  The Motion is granted with respect to the Conservancy's claims regarding: (1) liability and damages with respect to the clean up of the sewage lagoons; (2) liability for breach of express warranties that there were no underground storage tanks; (3) liability and damages for breach of contract with respect to remediation of petroleum contamination regarding the underground storage tanks and Pump House; (4) liability for remediation of petroleum contamination in the area south of the Pump House; and (5) liability and damages for the cost to clean up rubbish and trash on the Property.  The Motion is granted in part and denied in part with respect to the Conservancy's claim for damages regarding remediation of petroleum contamination in the area south of the Pump House; summary judgment is granted with respect to the $286,264.73 to which no specific objection is posed and denied with respect to the $14,559 to which specific objections are made unless the Conservancy is able to establish its entitlement to such damages in a prove-up.  To date then, the total damages awarded to the Conservancy are $876,964.21, subject to the undisputed $75,000 set off in favor of Wilder.

To the Court's knowledge, the only other unresolved issue remaining at this time is Defendant's counterclaim for breach of an oral agreement to reimburse Wilder for levee

repair in the amount of $3,869.50.  The parties are directed to confer and advise the Court within 7 days as to how they propose to resolve these two remaining issues.

ENTERED this 27th day of May, 2009.


_____
s/ Michael M. Mihm
Michael M. Mihm
United States District Judge